UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| TURF PRODUCTS CORPORATION, ITSELF AND AS ADMINISTRATOR OF THE TURF PRODUCTS EMPLOYEE SAVINGS AND SECURITY 401K PLAN, Plaintiff, v. VAL-COR CAPITAL, PETER VALACHOVIC AND EXECUTIVE TAX BENEFITS, INC., Defendants. | C.A. No. 07-CV-10532 |

## PLAINTIFF'S EXPERT DISCLOSURE

Plaintiff, Turf Products Corporation, hereby submits its expert disclosures. A copy of Plaintiff's expert report is attached as Exhibit A.

Plaintiff has identified but not attached each document which has been considered by the expert and which may be offered as an exhibit. Plaintiff is willing to provide such documents to the court if it wishes to receive them. Plaintiff did not attach the documents because they consist of numerous pages.

> TURF PRODUCTS CORPORATION,
>
> By its attorney,
>
> LAW OFFICE OF
> CHRISTOPHER J. TROMBETTA
>
>
> s/ Christopher J. Trombetta
> Christopher J. Trombetta (BBO No. 556923)
> 310 North Main Street, Suite 6
> Mansfield, MA  02048
> (508) 339-5900

Dated:  February 15, 2008

### CERTIFICATE OF SERVICE

I, Christopher J. Trombetta, do hereby certify that on February 15, 2008 a copy of the foregoing document has been served via electronic mail on opposing counsel in this action.

> s/ Christopher J. Trombetta
> Christopher J. Trombetta

**Karen L. Randall**
**76 Dorset Street**
**Springfield, MA 01108**
**(413) 733-1756**

February 15, 2008

Mr. Christopher Trombetta
Attorney at Law
310 North Main Street
Mansfield, MA 02048

RE: Turf Products Corporation 401(k) Plan

Dear Mr. Trombetta:

I have worked in the pension administration field for twenty-three years. I also completed extensive work on the Turf Plan in that capacity. After completing that work and reviewing additional documents which you were able to provide I confirmed my opinion that Executive Tax and Val-Cor both failed to meet their obligations as they defined them to Turf Products Corporation (Turf). The documents reviewed and relied on forming my opinions are included as an attachment to this report. An explanation of the obligations and failures follows below.

1. Executive Tax of Florida, Inc. (Exective Tax) and Val-Cor Capital, Inc. (Val-Cor) should have know that the Plan Document and Summary Plan Description had an eligibility requirement that was incorrect on its face in a 401(k) Profit Sharing Plan

   Turf's Plan Document and Summary Plan Description which were in effect beginning on September 1, 1989 and restated effective January 1, 1991 and continued in effect until 2003 through multiple amendments and restatements provided for retroactive entry on January 1st into the plan for any employee who is at least 21 years old and has completed one Year of Service (as defined by ERISA) at any time during the Plan year. Such entry must include the right to make employee deferral contributions via payroll deduction for the time in question. Making such employee deferral contributions would be impossible based on the payroll deduction system required by a 401(k) Plan and implemented by Turf. Neither Executive Tax nor Val-Cor did anything to correct either original plan document or the subsequent amendments provided to Turf Products.

   Pursuant to the payroll deduction system, employees consistently made equal payroll deductions over time, either a specified dollar amount or a specified percentage per pay period. I am not aware of any employee who ever attempted to make contributions as of January 1 of the year in which they became eligible to participate. I also understand that such a contribution would have been impossible, since on January 1st such individual would not yet be eligible. They would subsequently become eligible retroactively.

   This represents a document failure which could cause plan disqualification and should never have been a plan provision.

2. Executive Tax and Val-Cor were both aware that Turf was using a dual entry date system which neither complied with the Plan Document's entry date nor corrected the problem created by the Plan Document.

Turf was in fact allowing participants to enter the plan on the January 1st or July 1st immediately following the completion of the entry requirements. As a result an employee who was at least 21 years old and completed a Year of Service on January 15th in any given year would be allowed to begin making contributions as of July 1st. This still forced the participant to wait almost 6 months before making contributions and took away 6 months during which such a participant should have been able to make deferral contributions. The participants also did not receive proper employer matching contribution for the year in which they met the eligibility requirements and should have been able to contribute fully to the plan. Additionally, employees who met the eligibility requirements after July 1st were not allowed to begin contributions until the following plan year which means they not only missed a full year of possible deferral contributions they also missed a full year of employer match contribution.

Such a system of dual entry can be appropriate in a 401(k) plan, but only if it is specified in the plan document itself. In fact, for many years dual entry dates were very common in qualified retirement plans, including 401(k) plans, but the plan document and Summary Plan Description must specify such dates. Since Turf had not previously sponsored any retirement plans it does not seem reasonable that they would have come up with this dual entry system on their own. I believe that they were directed to use and confirmed in this dual entry system by both Val-Cor and Executive Tax.

3. <u>Executive Tax should have determined and corrected the eligibility problem when completing their Semi-Annual and Annual Reports</u>

   Pursuant to the contract, Executive Tax also prepared annual reports. Those reports consisted of several parts. One part, the employee census, listed each employee and his or her date of birth, date of hire and date of participation. The information for this portion of the report, with the exception of the Date of Participation, is determined from the employee census and payroll data provided by the client. The date of participation / plan entry is generally determined by the pension administration software used. This information is then confirmed by the individual preparing the report.

   A second part of completing the reports is trust accounting. This involves reviewing all plan asset data provided by the investment or insurance company. Val-Cor sold the plan investments to the trustees. The plan was originally invested in an unallocated group annuity contract with Lincoln Financial Group. After several years, the money was transferred to a Lincoln Insurance Company group annuity contract which allowed participants to choose their own investments. Lincoln, as part of their contract service, provides quarterly reports to the Trustees, the agent (Val-Cor) and on request to the pension administration firm, which was Executive Tax. For each period these reports, among other things, show for each participant the beginning balance, contributions, investment gains / losses, withdrawals, fees, loans taken, loan payments (divided by principal and interest) and ending balance. In addition, a separate portion of the report provides detail of each transaction which occurred during the period by fund, date and amount.

   By reviewing and reconciling this data Executive Tax would have to see when new participants began making contributions. In normal processing these would be compared with the entry dates and the fact that months passed after an employee became eligible before any contributions were made on his/her behalf should have been apparent. This indication is even more glaring when one considers that a newly enrolled employee who opts to contribute to the plan would elect to contribute as soon as possible after being informed that he could do so. No reason would exist for every such employee to delay contribution by several months.

   This type of problem is a plan qualification failure and requires correction under a government amnesty program which would allow Turf to correct the problem and prevent plan disqualification. Disqualification would harm the participants by making their accounts

immediately subject to tax and tax penalties. Turf filed a request for relief under such a program and the correction method which was approved was to allow Turf to retroactively enter all employees on the date they met the eligibility requirements.

4. <u>Val-Cor and Peter Valachovic had an obligation to make sure from the inception and initial set up of the plan that the proper eligibility and entry requirements were applied.</u>

   Val-Cor had an obligation to notify Turf or the Trustees that the eligibility and entry requirements Val-Cor designed and included in the plan document were not being followed. Val-Cor provided the initial plan design, document and set up for the Turf plan and as such had to be aware that the plan document and the dual entry system were in conflict, and that the dual entry system was incorrect. Val-Cor was responsible for not only educating the employees, but also the employer and trustees about the plan when it was initiated and thereafter

5. <u>Executive Tax had an Obligation under the Service Agreement to Stop Use of the Dual Enrollment System</u>

   Executive Tax had an obligation to ensure that Turf acted in a manner pursuant to the terms of the Plan. Moreover, Executive Tax also needed to advise Turf of the inappropriateness of the system based on their position as a third party administrator. It occupied a position where it advised Turf of issues as to the Plan. I understand that Executive Tax provided such advice to Charlene Winot. Ms. Winot was a Turf employee who was asked to assist in the enrollment of employees as one of the responsibilities of her position. She contacted Executive Tax regarding the proper way to do this and had her understanding of the dual entry system confirmed. I also understand that it provided such advice on other occasions.

   Moreover, in my experience, a third party administrator would advise a plan as to the use of an inappropriate system pursuant to its contractual obligations to service or manage the Plan. Such advice would be provided directly to the business owner and / or plan trustee.

   Pursuant to the contract, Executive Tax's obligations included, among others, providing trust accounting and preparing annual reports showing plan benefits. Trust accounting required Executive Tax to monitor and reconcile all transactions conducted by the Plan and to verify that they had been done correctly. Such transactions included those concerning contributions made by newly enrolled employees. The dual date enrollment system would have indicated that such contributions were not being made correctly. The system also was inconsistent with the terms of the Plan which Executive Tax had provided. Accordingly, as part of its accounting responsibilities, Executive Tax had a contractual obligation to notify Turf of the wrongful use of the dual date enrollment system.

   Executive Tax needed to ensure that the benefits information was accurate. Knowing of a system deficiency would indicate that the amounts were inaccurate. Executive Tax contractual obligation to confirm proper benefits also translates into an obligation to notify Turf Products that benefits were not correct and that this was a direct result of using the dual date system.

   Although I will testify to the following as a fact witness I wish to note that to complete the correction, Turf was required to take several additional steps. First, they were required to contribute to the plan on behalf of all such employees an amount equal to the Average Deferral Percentage (ADP) of all employees who did contribute during the plan year in question. Second, they were required to make corresponding corrective match contributions based on the deferral contributions. Finally, they were required to contribute amount equal to lost earnings calculated for six months the first year of correction for each participant and annually thereafter based on the highest rate earned by any investment available in the plan for that period.

I calculated the deferral percentages for each year by adding up the deferral percentages of those participants who did defer and dividing it by the number of participants who deferred. Then, using the payroll and personnel records I calculated the corrective contributions. The corrective deferral contributions were calculated beginning with the first payroll period beginning after the eligibility requirements were met and continued until the employees either began making contributions themselves or other employees similarly situated began to make contributions. Once this calculation was complete I calculated the match contribution amount according to the plan formula.

The lost earnings were calculated by comparing the January 1st or starting market price of each available fund with the December 31st price of the fund and determining the percentage of increase or decrease in value during the year. I then used the highest rate to calculate the required earnings deposit for each employee for each year. The grand total of these corrections was $287,928.56 which Turf deposited to the plan.

6. <u>Executive Tax had an obligation to notify the Plan Sponsor / Trustee when Data was not timely received</u>

The standard in the industry obligated Executive Tax to notify the Trustee of material matters. In the event that a trustee then did not respond, the servicing or managing entity, such as Executive Tax, would then terminate its contact with the Plan. In doing so, it would indicate that it would no longer be providing services to the Plan. Such notice not only would terminate the responsibilities of the entity but also would alert the Trustee again as to the deficiency or problem then existing.

Executive Tax's failure to contact the Trustee regarding its failure to get timely information is not in accordance with the practices of a Third party Administrator providing qualified pension plan administration. The practice with a calendar year plan in my experience was that the initial data request was sent approximately December 15th. Beginning January 31 a series of follow ups would occur if the data was not returned or the client had not communicated with the firm to indicate when the data would be sent. Generally, the first follow-ups would be by mail. For 401(k) plans with testing deadlines in mid-March a second follow-up by phone would happen on about February 15th and by March 1st a call would be made to the Trustee or business owner.

Follow-ups on a regular basis with the Trustee would continue until either the missing data was received, the client informed us that they had gone elsewhere or until we informed the client that they needed to go elsewhere for pension services. One of the foregoing would result within a maximum of one year after the initial data request.

Executive Tax had in earlier years when data was not received followed up with Turf. Their initial follow-up was to John Motto and subsequent follow up was made with the Trustee, Fred Zeytoonjian.

Val-Cor and Peter Valachovic also had an obligation to insure that the proper and necessary information was being provided to Executive Tax because they maintained a relationship to the plan with their assistance in enrolling new employees in the plan, answered questions from participants about the plan and continued to receive compensation from the plan.

7. <u>Executive Tax had an opportunity to Terminate their contract with Turf and failed to do so</u>

Executive Tax not only failed to notify the Trustee of the inability to obtain information but also failed to terminate its contract with Turf. Accordingly, neither the Plan Sponsor nor Trustee received any notice that Executive Tax would not be performing its duties. While such a practice is in an of itself, a violation of its contractual obligations, I also am not aware of any situation as

to which a third party administrator failed to contact a Plan Trustee or business owner concerning the failure to receive information timely or at all.

8. <u>Executive Tax failure to notify Trustee of the data problem resulted in a failure to timely file Form 5500 for several years</u>

   As a result of Executive Tax's failure to notify Turf or the Trustee of Plan issues, it failed to prepare Forms 5500 for 1999, 2000 and 2001. Accordingly, the Plan later sought in 2003 to file such Forms 5500 pursuant to a governmental correction, or partial amnesty program to avoid significant late filing penalties. Doing so, however, created an obligation to the Plan to report all deficiencies of the Plan.

9. <u>Executive Tax failure to notify Trustee resulted in uncorrected ADP test failures for several years as they were obligated to under the Service Agreement</u>

   By not obtaining the necessary data and not notifying the Trustee of this lack Executive Tax was unable to complete required ADP tests to prevent plan discrimination for 1999, 2000 and 2001. The relevant contract obligated Executive Tax to perform such tasks. Such testing determines if highly paid employees had been permitted employees to contribute too much to the Plan. As a result, Turf needed to pay a penalty of $106,353 to the Plan. Such a penalty would not have been incurred had the anti-discrimination testing had been performed for 1999, 2000 and 2001 in a timely manner.

10. <u>Executive Tax failed to properly monitor participant plan loans for proper set up and repayment</u>

    As part of performing its annual reports, as required by the contract, Executive Tax prepared loan summaries. Such summaries reported loan information and other information related to outstanding loans. The existence of such loans also affected Plan benefits. The amount of any such loan would be reflected separately from invested funds and would reduce any benefits due in the event of a distribution. Pursuant to the contract, Executive Tax also had the obligation to show Plan benefits for each employee. Despite its contractual obligations, Executive Tax failed to determine if loan payments had been made on time. Executive Tax prepared loan amortization schedules. It knew what balances should exist on each date. It also placed loan balances in its loan summary, which comprised part of its report. A single comparison would have showed that payments had not been made. Executive Tax failed to make this comparison. Accordingly, it did not fulfill its contractual obligations to Turf Products by not accurately determining benefit amounts and by failing to detect late loan payment issues as part of performing its trust accounting responsibilities.

    The issue of loan deficiencies needed to be addressed during the reporting to the DOL as part of the amnesty program. As a result, Turf needed to pay the Plan a penalty. Such a penalty would not have been incurred had Executive Tax detected the late loan payments in the year when such payments had not been made.

11. <u>Executive Tax should have known that the Lincoln Loan Request Form was not sufficient to meet the Plan's obligation when loaning money to participants</u>

    A plan is required to provide and have signed by the participant certain forms when loaning money. These include a Promissory Note with spousal consent requirements, Truth in Lending Disclosures as well as a copy of the amortization schedule and any paperwork required by the investment company.

    Lincoln provided a form which did have a spousal consent section, but it was not sufficient for plan purposes only for their own purposes. Executive Tax should have been aware that all plan requirements were not being met.

12. <u>Val-Cor and Executive Tax had an obligation to make Turf aware that both employee deferral contributions and loan repayments that were withheld from employees pay had to be remitted timely and properly</u>

Turf used a system whereby they remitted employee deferral contributions in the middle of the month after they were withheld from employees' paychecks. They remitted loan payments quarterly at most.

The Department of Labor regulations require that employee deferral contributions and loan payments were to be deposited to the plan as soon as administratively feasible after they were withheld. Neither Val-Cor nor Executive Tax spoke with anyone at Turf about modifying the system that was set up by Val-Cor with Turf, to provide for more frequent remittances to Lincoln so that they would not risk violating the relevant regulations.

Finally, I am completing this report as an expert in the field of pension administration. I have never served as an expert in a court case before this. I am being paid at the rate of $160.00 per hour for my services as an expert. In addition, I will be testifying on a factual witness in this case since I completed the multiple corrections required to keep the Turf plan qualified and in compliance with ERISA and the various other federal statutes and regulations which are relevant to Qualified Retirement Plans.

Respectfully submitted,


/s/ Karen L. Randall

Karen L. Randall, J.D.

# Attachment 1

## Documents Used in Preparing this Report

1. Turf Products Corporation Adoption Agreements and Plan Document (including IRS opinion letters) executed by Turf on December 21, 1991
2. Turf Products Corporation Adoption Agreements and Plan Document (including IRS opinion letters) executed by Turf on December 15, 1997
3. Executive Tax Administrative Service Agreement entered into with Turf in 1989
4. Implementation Strategy prepared by Peter Valachovic in 1989
5. Executive Tax Semi-Annual and Annual Reports
6. Lincoln Financial Reports for the Turf Plan
7. Affidavit of Frederick Zeytoonjian
8. Affidavit of Charlene Winot
9. Follow-up letters from Executive Tax for the 1996 plan year:
    a. April 2, 1997 letter to John Motto at Turf Products.
    b. April 25, 1997 letter to Fred Zeytoonjian, Trustee at Turf Products